Good morning. Daryl Fruth and Grace Wan of Pharrell Lebron and Martel on behalf of Plaintiff Appellant Oscar Jones. May it please the Court. Our client found himself in a state of limbo for two years where he was held in a county jail, not accused of any crime, not adjudicated a sexually violent predator. He's there in civil detention, yet he was placed in the general population with people that were awaiting criminal process and who had been convicted as criminals, and he was subjected to illegal searches. Then he was placed in total separation where he was prevented from accessing the law library. He was not allowed to attend the religious services that he'd been attending while he was in general population. And overall, his conditions of confinement amounted to punishment. When he was bringing these claims under Section 1983, as a pro se litigant, he was not provided the benefit of the doubt, as he should have been as a pro se litigant. He was forced to comply with a 60-day, very compressed discovery schedule. He was not given the ability to extend that when he showed that he needed more discovery. Unless there are any questions about the timeliness of the appeal, I'd like to focus on the first argument the Court asked us to address, which is whether his claim should have been tolled. Section 352 of the California – well, I should say that the Court erred by not tolling Jones's claims for two years under Section 352.1 of the California Code of Procedure. Jones was incarcerated for a parole violation. For the purposes of Section 352.1, he was in jail and execution under the sentence of a criminal court. That was the holding in Ellis v. City of San Diego, 176 F3D, 1183 at 1189. Can you give us a little more detail about the circumstances? Was he first put into civil segregation, and then was his parole revoked? How did this work out? He was on parole. When his parole was revoked, he was placed in the county jail at Sacramento, and this is in June of 1997. He was then transferred to a vocational center for a couple weeks, and then he was sent to prison in Susanville. When his parole revocation was about to expire, so he was – he was, you know, in custody, and it was going to be until mid-December. And on December 3rd, he was transferred back to Sacramento County, and that's when he was placed in general population, where he stayed for over one year. But the parole revocation expired on the 14th of December. So it was from December 14th through, you know, for the following year that he was in general population at the county jail under – as a civil detainee. And he shouldn't have been. State law would have – State law required that he not be held as a civil detainee in the same population as people awaiting criminal and criminal – But are you saying to us that he was in criminal detention up through this date, and then his suit was within one year of that, or – Yeah. Maybe I'll walk through real quickly. So he was in – he was in this general population from December 3rd, 1997, until December 9th, 1998. From December 9th, 1998, until January 4th, 2000, he was in the total separation, where he was separated out. He was transferred to Atascadero on January 4th of 2000, and he filed his civil rights lawsuit within one year of that. So he was in continuous – he was continuously incarcerated from December 3rd through January 4th, 2000, all at the Sacramento County Jail. But part of it was criminal and part was civil. Is that right? Well, I guess you could say that for some part it could have been criminal, strictly criminal in the sense that the parole – his parole was still active. And that could be two – that could mean two things, really. He was – his parole had been revoked, and he was being held in custody through December 14th, 1997. And then the parole was revoked – I mean, his parole period ended on March 21st, 1998. But even the period when he was – even the period beyond that when he was held, it was still – I would argue he was still being continuously incarcerated under civil – in execution under a sentence of a criminal court, because the only reason he could be incarcerated under the civil – the Sexually Violent Predator Act was because he was already in the custody for the criminal case. So if it – if he hadn't been in custody criminally, there's no way that the State could have held him under the – under the SVP Act. And that's – that's Section 6601A1 of the Welfare and Institutions Code. So in addition to Section 352.1, the Court also erred by not equitably – by not applying California's mandatory factually intensive three-part test for equitable tolling. You know, I think I've got my timeline mixed up again. You said that the parole revocation occurred December 14th, 1997. Is that true? December 14th, 1997. That's right. But he was in general population before that on the civil – is that true? I'm sorry. His parole – his parole was revoked in June of 1997. Okay. And then that – the incarceration for that revocation ended on December 14th, 1997. Oh, okay. I got you. But what happened on March 19 – March 21st, 1998? That's when his parole expired. He wasn't on parole any longer. Beyond that, he was no longer on parole. Okay. Thanks. So at what point then was he in the execution of a criminal sentence? He was in an execution of a criminal sentence for the entire period in the sense that he was incarcerated because he was picked up on a parole revocation, and then he remained incarcerated at the same jail for the entire period. And the only reason that he could be in jail that entire time is because he had been picked up on a criminal sentence. But what was the criminal sentence that he was – that was being executed? It was the revocation of parole. And how long did that extend? That extended until December 14th, 1997. Nineteen? 1997. And then he remained – At that point, he was no longer in execution of a criminal sentence. Well, I think arguably because he remained continuously incarcerated – Well, no, but there's no criminal sentence holding him. Isn't that correct? That's correct. That as of that date – So, I mean, it isn't arguable this criminal sentence stopped. His criminal sentence – the revocation period ended on December 14th, 1997. All right. So, I mean, why talk about it as arguable? It isn't arguable. I think you've got to go under equitable if you're going to succeed. At least that was my initial impression. So the – under equitable estoppel, there's really just three prongs. It's did the defendant have notice of the claims, would they be prejudiced if they had to defend against them, and did the plaintiff act in good faith? This is a mandatory three-part test that California – that California courts apply. The magistrate judge here didn't apply this test. Instead, it gave just a cursory analysis and said that ignorance of the law is not a valid reason for tolling a statute of limitations. It cited one case for this, which was the Garabedian case, and that case was criticized by the leading Ninth Circuit case on estoppel – excuse me, on tolling, which is Cervantes v. the City of San Diego, 5F3D 1273 at note 2. Here, defendants receive timely notice of the claims. There's really no question about that. Jones raised the issues when he was in confinement. That's at ER 272. And the defendants concede that he should, could, and would have raised these complaints as an essential defense to his commitment proceedings. Defendants have not identified any prejudice in having to defend against these. And the district court certainly found no bad faith on the part of Jones. So the court – the case should be remanded so that the court can apply the correct factors and then toll Jones's claims. Unless there are questions, I was going to reserve five minutes for rebuttal. Roberts.     Good morning, Your Honors. May it please the Court. My name is David Melton. I'm from the Porter Scott law firm in Sacramento. With me today is my associate, Erica Rosasco. And we're here today, and I'm glad to be here today, on behalf of the County of Sacramento and Sheriff Lou Blantis, if I may proceed. Sure. The difficulty in this case, Your Honors, is one minute that Mr. Jones wants to say, I'm a prisoner and I should take advantage of prisoner rules, and those are for the substantive civil procedure rules. And then for his substantive claims, he wants to say, I'm a civil detainee and you've violated my civil rights. I am given up on the notion that the appeal is not timely in this case. Granted, the statute, rule of appellate procedure 4C1, does say an inmate confined in an institution. But before the enactment of that rule and afterwards, all the cases talk about the prisoner mailbox rule, and that was a codification of that. Now, it's obvious when you're a prisoner that you're not going to have a lot of rights and you don't certainly want the guards to take your appeal, to sit on it, and to put it in the mailbox after your appeal has run. But Mr. Jones was not a prisoner in this case. He was a civil detainee under the Sexual Violent Predator Act, and he was serving his time in – well, not even serving his time, but he was in Atascadero State Mental Hospital. The questions that we don't have on this appeal, because everything happened after the discovery was closed, is what sort of confinement does he have there? What sort of access to a mailbox does he have? Now, his original proof of service said that he put it in the mail. He subsequently asked the court's query about whether or not his appeal was timely, and he said, well, they do have an eternal mail system, and by the way, they also have a mail center from 830 to 330. It's open every day. So we don't have a lot of facts about what opportunities he has to get it to the mail. Kagan. Well, are you saying to us that you are giving up on that issue? I'm not giving up on that issue, Your Honor. Oh, you're not giving up on that. We both heard you saying it the other way. Well, that would be a lot of wasted time for arguing against that. No, I believe that his appeal is not timely, Your Honor. How do you get around the plain words of the statute? Well, I wish there were some cases that spoke to it. That's that rule, I should say.  No, this is it. So how do you get around the plain words? I would look to the prison or the mail log system. In their supplemental excerpts of record, they produced a log that they got. And at the top of that, it says not prisoner log, not inmate log, patient. He's a patient, not a prisoner. Yes, but he's held because of the nature of his prior crimes. He's held like a prisoner, is he not? Well, I believe it's different. I believe that the reason that he's in Cascadero is hopefully to be rehabilitated. That's right. But what if he said, I want to go on and leave because I have to pursue my case? What would happen? Hopefully they won't let him go. One of the reasons he's there is I would submit that he's a danger to society, and that's why the SVP Act was designed, because obviously it didn't help that he was incarcerated in prison for a while and somebody thought that he might go out and commit the crime again. So he's not free to leave the grounds and put his papers in a mailbox. Hence, he gives it to the authorities there. What's different from that analytically from a prison? That's a good question. The problem is I can't tell you because I haven't gone down there to take his deposition while he's in Cascadero to find out what the conditions of his confinement are. I can tell you in other cases, some prisoners we can call by on the phone. You can actually, no, they're not prisoners, but the patients can answer phones. They call us back. I know that prisoners in State facilities don't have that luxury. So there may be some differences that would sway your vote. And if it were that this was timely, I'd ask that it be remanded back for further information about what benefits he has. What if he does? If I told you that he did have access to a big blue mailbox in the day room of the facility that he's at and he could have put that in there, then I think there might be a difference. But if there's any more questions, I'll move on to some of the more unusual. Your opponent cited Elliott against Union City and quoted it, and you never even replied to it. Is that because you don't have any answer? Well, Your Honor, the Elliott case is a different issue. I mean, I'm asking you a question. Is that because you had no answer? I don't believe that it applies in this case. Well, why did you say so? I'm not sure why, Your Honor. You left it unanswered. I thought the authority that we did cite clearly showed that in that case, now we'll flip the argument. The plain language of that statute says a person imprisoned on a criminal charge or in execution under the sentence of a criminal court. The whole reason that Mr. Jones was brought to the Sac County Jail was to await SVP proceedings. Now, we had to bring him there because his parole was due to be up in two weeks, so they transferred him from Susanville right to our facility. So he was in there as a civil detainee really from the day that he got there on December 3, 1997. He wasn't spending up the rest of his parole there. He was there to await SVP proceedings to start. But the Elliott speaks of actual uninterrupted incarceration. In that case, Your Honor, that dealt with whether or not someone who was in a facility like a jail and was awaiting an arraignment, a criminal charge, and the court said, well, we're going to look at that period of time from when you got there up until your arraignment as being incarcerated on a criminal charge. This guy is not here on a criminal charge. He's here on a civil proceeding. That case just doesn't apply. This ---- Well, they extended the literal terms a little bit, which is what we're being asked to do here. This is an analogy. It's not absolutely dispositive, but it's certainly an analogy. And certainly the California legislature, had it wanted to have this tolling, could have added language that would make this very clear. They could have put civil detainee and SVP. Well, maybe they didn't think of it because the problem hadn't arisen. So we're asked to do something equitable, not something provided by the actual words of the statute. The equitable cases that have been cited by Mr. Jones seem like they would apply in that three-part test again when the prisoner or ---- I keep saying prisoner. I can't get that out of my head. Where the ---- You see our problem. I think that tells us all something, counsel. I'm sorry? I think that tells us all something, counsel. That may only tell you about my abilities at oral argument, Your Honor. But analytically, I mean, I think you touch on a good point. I know you're headed in a different direction. But meaningfully, there's no meaningful difference between an ordinary prisoner and Mr. Jones in this case. He's incarcerated against his will. You say you don't want him out because he's a sexual predator and a danger to society. Analytically, what's the difference? Well, I guess that's sort of the problem that the county has, trying to determine how to handle this guy. Clearly, while he's waiting for his charge, he's treated one way and the legislature says, no, we want you to treat him a different way in your jail so that he gets different rights and benefits. I mean, that's sort of dancing on the head of a pin, if you will. But at least when he's in Atascadero, I think we can all agree that it's definitely he's not in jail at that point and he's not a prisoner. And whether or not he filed his appeal timely is when he was incarcerated and held at Atascadero and not in the Sac County Jail. I mean, clearly, that's the distinction. And he waits. What no one's ever addressed is why he waits 11 months after he gets there to file his complaint. If you're in the record, six months after he was at Sacramento, it's very clear that he knows or he thinks he should be treated differently. Six months. During that one year that he is in the general population, he doesn't complain about having law library access like he does when he is finally separated away from the general population. So maybe a long-winded answer to your question is there are some important distinctions in this case. And clearly, it is difficult, though, analytically separating both of them. I detained you on the way to a point you were going to make. Go ahead. Okay. I'm not sure where I was at, but are there any more questions I can answer on equitable tolling or statute of limitations? Well, it's clear that the magistrate judge didn't consider equitable tolling. And why shouldn't we take counsel's invitation and remand it for, so you can make these arguments in front of the district court or the magistrate judge? Well, I think in the cases that we initially cited, there is something that the defendant has done to prevent the person from filing their complaint in this case. And other than the arguments about not getting access to the law library, at least for the first year, he had access. The more important question is he had an attorney for his SVP proceedings, not only from day one that they were instigated, the probable cause hearing, and that trial. And it was all about whether or not he should be a civil detainee under this Act. So clearly, he had access to the law. I could walk into a law library, and I'm not sure I would get all these issues being a lawyer. And I don't know that the argument that he didn't get enough law every time would have made a difference. But he had access. Was that assigned counsel, or did he pay for that? I'm sorry? Was that counsel assigned to him, or was he paying for that? I believe that that counsel was assigned to him. So maybe he felt he couldn't handle something else that wasn't the issue that he was assigned for. And we don't have the information about how that went, I suppose. But he certainly had access that a lot of other people who have made equitable tolling arguments would have. The case that they cite, and maybe this is where I lost track, was the prisoner has availed himself of another procedure, some sort of administrative remedy. That doesn't work, and then he has to file his civil complaint. They then kind of bootstrap that back to that administrative remedy, saying, well, it should be told while he was trying to work it out. He didn't do anything in this case. There wasn't any other procedure. Whether or not he told prison officials that maybe he had a problem, I mean, that's not what the case that they cited in their briefs and that three-part test is all about. You know, we haven't heard about the merits of his claims from either counsel. I'd be interested to have your view as to whether there are merits to his claims. I can take them kind of one at a time. I don't believe that we violated his right to practice religion. He did, when he was there for the first year, get to attend some Bible study meetings. When he was segregated, there wasn't that opportunity, but he was given access to religious materials. We didn't prevent him from practicing his religion. I believe in regards to the fee. What was his religion? It's not in the record, Your Honor. No one thought about asking that question. From what I've gleaned, I would assume that it was a Christian. Your Honor. Do you know what materials were furnished to him? I believe that he did have access to things like a Bible and other religious material. But, again, the record doesn't have more information than that. Well, didn't he say in his objection to the magistrate judge's findings in Rex that he was a Christian, a member of the Christian faith? If he said that, Your Honor, I missed it. I believe that the Sacramento County Main Jail has an obligation when he's coming back from court to make sure that he's not carrying contraband, weapons. I do believe that in things related to his incarceration, that the jail has been given some latitude in making sure that the jail is safe. The law library aspect, for the first year, he doesn't really complain about it. He was given the opportunity to have cases brought to him after that. Any more questions you can address? Well, he complained about the conditions in which he was kept, that he didn't get enough clean clothes, that the temperature was very cold. Now, he was supposed to be kept like a civil detainee and with his little clothes on. And I don't think that there's anything in the record to show that those things were done intentionally to deprive him of his civil rights or to punish him. He was in a different area of the jail. He might make complaints like that, but a lot of people make complaints about their conditions of confinement, wherever they are. But is intent necessary in this circumstance? I don't believe that intent is an element or prerequisite. But he did manage, it seemed like you were getting towards, was it a punishment? Was it something they did to him that I don't believe changing the temperature in his cell or the opportunity to take showers was part of that? Anything else, Your Honors? No, I think that's all. Thank you for your argument. I have five quick points on rebuttal. First, with respect to Jones being represented by an attorney, that's really a red herring because he was not being represented for Section 1983 for his civil rights claims, which is what's important here. As far as his Christian faith goes, or his religion, he testified that he is a Christian at ER 537. And it's also shown by the fact that he attended more than three dozen. He attended Bible study on more than three dozen occasions when he was able to do it, before he was prevented from doing that. And I'll get you the site for that. I want to turn to the merits, though. And, you know, fundamentally, Jones has several claims. First Amendment, free exercise, not being allowed to exercise religion, not having access to the law library, not being allowed to step in the law library, 14th Amendment. He has Fourth Amendment claims for illegal search, where Jones was being searched unreasonably. In order for the search to be reasonable, there's a four-part test. You have to look at the scope, the manner, the justification, and the place in which it was conducted. And here we know that it was being done in a very unhygienic fashion. That's what the evidence shows. And that it was being done in a place where others could see, so it wasn't being done privately. For these reasons, it makes it an unreasonable search. And you have to keep in mind, this is happening at a time when he's a civil detainee. He's not accused of any crime, and yet he's being searched like this. The district court said that from the documents submitted, it is not clear why he was even strip searched. So there's definitely tribal issues of fact here. And when you look at what's going on with the strip searches, you know there must be something wrong with the Sacramento County's policy, because just last week, the front page of the Recorder, it was announced that they're settling a lawsuit for several million dollars. That's outside the record, counsel. I could address that. No, that's fine. So now turning back to his – so I've talked about several of his independent claims, which all state causes of action are 1983. But more broadly, he has a claim for being punished when he shouldn't have been. He wasn't convicted or even accused of any crime. And we know from Lynch v. Baxley that when you're in temporary detention, that can't be any worse than the involuntary confinement that you could be committed to. Purgatory should not be worse than hell. And here it was much worse. The state acknowledged that it would become a problem if administrative segregation, if you had a small number of civil detainees, who were then not allowed to do the things that just ordinary prisoners and ordinary people waiting a criminal process would be able to do. That's the – Well, to accept your argument on this point, don't we have to reject your argument that he was arguably confined under the terms of his criminal sentence that you began your argument with? Not necessarily, because – You can't be a civil detainee and a criminal detainee at the same time, except perhaps that overlap period. But – No, but let me just – let me just address this, because this is very important. So here's the argument. He was a civil detainee, but it was the period – it's the – as Eliot says, it's the – it's the continuous incarceration that's key. It's not – it's actual interrupted incarceration is the touchstone for this. So that's what's important. He was incarcerated. For a period of that time, he was being held criminally. And just like in Eliot, his claims happened when he wasn't in custody under execution of a sentence or under charge. It was during – it was before an arraignment. But this Court said that doesn't matter. The fact of the matter is he was continuously incarcerated for the entire period and that's why Section 352.1 should apply. So in this case, I don't think he needs to trade one right. I don't think he needs to trade his constitutional rights to being protected from punishment in order to avail himself of the equitable tolling rights and to the rights provided under – No, I understand your Eliot argument. I think you began your argument talking about how he was arguably detained under the criminal sentence for his entire period. And if that's so, then it does implicate your Eighth versus Fourteenth Amendment argument. I understand. But I guess the distinction I'm making is that it's more that the only reason he can be detained civilly is because of this earlier predicate criminal act. And for that reason, Section 352.1 would apply. But during that period of time, he's a civil detainee and he deserves all the rights that are accompanied – you know, that he would have as a civil detainee. That's the argument. Okay. Are there any other questions? No. Thank you for your argument, counsel. Thank you. The case just heard will be submitted. Thank all of you for your arguments. Peterson versus Plummer is submitted on the briefs. The next case may be mispronouncing. This is Agamon versus Corrections Corporation of America.
judges: B. Fletcher, Noonan, Thomas